Judge Marion F. Edwards, Pro Tempore
|, On December 18, 2015, the Honorable Mitchell J. Landrieu, the Mayor of New Orleans, signed into law an ordinance enacted by the New Orleans City Council that provided for the removal from publicly owned property of three monuments depicting General P.G.T. Beauregard, Jef *321 ferson Davis, and General Robert E. Lee, in their roles as former leaders of the Confederate States of America.[1] The enactment of the ordinance capped a six-month process of intense public debate and contentious governmental hearings concerning the fate of the three monuments. In enacting the monument removal ordinance, the City Council acted in accordance with City Code section 146-611. This ordinance provides that “[m]onuments, statues, plaques, or other structures, erections, or works of art commemorating an event or individual shall be removed from outdoor display on public property” after a finding by the City Council that such an item “constitutes a nuisance” in that:
|a(l) The thing honors, praises, or fosters ideologies which are in conflict with the requirements of equal protection for citizens as provided by the constitution and laws of the United States, the state, or the laws of the city and gives honor or praise to those who participated in the killing of public employees of the city or the state or suggests the supremacy of one ethnic, religious, or racial group over any other, or gives honor or praise to any violent actions taken wrongfully against citizens of the city to promote ethnic, religious, or racial supremacy of any group over another;
(2) Has been or may become the site of violent demonstrations or other activities that may threaten life or property; and
(3) Constitutes an expense for maintenance or the provision of security on a recurring basis that is unjustified when weighed against the historical or architectural significance, if any, of the thing and/or the merits of or reasons for outdoor display of the thing.
Shortly after the removal ordinance’s passage, the Monumental Task Committee, Inc., the Louisiana Landmarks Society, and Beauregard Camp No. 130, Inc., brought suit in federal district court against the City and several federal agencies in an attempt to halt the removal of the statues. In the context of this suit, the federal plaintiffs sought a temporary restraining order and preliminary injunction. Their petition asserted twelve causes of action encompassing claims that the defendants’ actions violated: 1) federal statues enacted for the protection of historic landmarks; 2) 42 U.S.C. § 1983 and the First, Fifth, and Fourteenth Amendments of the United States Constitution; and 3) Article XII, Section 4 of the Louisiana Constitution; and 4) City Code section 146-611. The federal district court judge denied these plaintiffs’ request for injunctive relief on January 26, 2016. See Monumental Task Committee, Inc., et al. v. Foxx, et al., 157 F.Supp.3d 573 (E.D. La. 2016), affirmed sub nom. Monumental Task Committee, Inc., et al. v. Chao, et al., 678 Fed.Appx. 250, 2017 WL 892492 (5th Cir. 2017).
|aOn January 27, 2016, Pierre A. McGraw, who is the founder and president of the Monumental Task Committee, filed the present suit for declaratory and injunc-tive relief in Civil District Court for the Parish of New Orleans against the City and Mayor Landrieu[2] in a further attempt *322 to halt the removal of the statues.[3] Although he argues fewer causes of action than the federal plaintiffs, Mr. McGraw’s bases for injunctive relief largely mirror those claims set out by the Monumental Task Committee in its federal petition. Like the Monumental Task Committee, Mr. McGraw argues that unless the City is enjoined from removing the monuments: 1) his substantive due process rights under both the U.S. and Louisiana constitutions will be violated; 2) his procedural due process rights will be violated because the monument removal ordinance did not comply with City Code section 146-611; and, 3) his rights under Article XII, Section 4 of the Louisiana Constitution will be violated. Unlike the Monumental Task Committee, however, Mr. McGraw argues that injunc-tive relief is also warranted because City Code section 146-611 unreasonably restricts his property rights, thus causing an unreasonable exercise of police power, in violation of Article I, Section 4 of the Louisiana Constitution.
[4The City opposed Mr. McGraw’s request. The district judge denied Mr. McGraw’s request for a temporary restraining order and directed that a hearing be held on his request for a preliminary injunction.[4] At the close of the February 5, 2016 hearing, the district judge denied Mr. McGraw’s request for a preliminary injunction:
The Court having heard argument of counsel, having received evidence and I mean I appreciate the passion and interest on both sides and I do not find that the City breached its responsibility under the Ordinance. .., Again, my personal thoughts aside, the law presented, the evidence presented, the Court would deny the injunction that’s been prayed for finding that there is no violation of the Louisiana Constitution that the City followed the strict mandates of its own Ordinance and that there are no property rights specifically that have been inserted and or due process rights which would necessitate the granting of injunction or the finding that plaintiffs have the ability at some point to win on the merits relative to this case.
The district judge memorialized her oral ruling in a judgment signed on February 5, 2016.
Mr. McGraw then sought a devolutive appeal of the February 5, 2016 denial of his request for injunctive relief. On appeal, Mr. McGraw argues that the district judge erred in denying his request for injunctive relief. He specifically argues that the district judge erred in refusing to conclude that he had acquired vested property rights in the monuments by operation of the civilian doctrine of negotiorum gestio because he has invested his own time and money in their maintenance and upkeep.[5] *323 |sHe, likewise, argues that the monuments are external symbols of his own distinctive culture, and thus protected by Article XII, Section 4, of the Louisiana Constitution.[6] Because he had acquired such property rights, he contends, the district judge thus erred in refusing to find that damage to the monuments occasioned by their removal and transportation would likewise cause irreparable harm to his rights in the monuments in the absence of injunctive relief. Such irreparable harm, he argues, violates his state and federal substantive and procedural due process rights.[7] He also asserts that the City’s actions contravene Article I, Section 4 of the Louisiana Constitution, which guarantees his rights as a property owner to hold this property free of unreasonable statutory restrictions and exercises of police power.[8] And, he argues that the district judge erred in refusing to conclude that the City’s removal of the monuments violates the protections afforded by Article XII, Section 4 of the Louisiana Constitution.
Having reviewed the record and the applicable law, we affirm the February 5, 2016 judgment. Our purpose here is not to sit in judgment upon the propriety, vel non., of the City’s political resolutions. The issue before us is not whether the monuments should be removed or left to stand. Rather, we are called upon to decide whether the district judge erred in denying Mr. McGraw’s request for a preliminary injunction. In this case, Mr. McGraw has failed to establish that he has |fiacquired any type of property rights in the monuments at issue, all of which are public things owned by the City in its public capacity. The district judge, accordingly, did not err in concluding that Mr. McGraw could not establish that he would suffer irreparable harm in the event the monuments are removed by the City. We now explain our rationale in more detail.
I
Before we address Mr. McGraw’s assignments of error, we first discuss the ordinance employed by the City to remove the monuments at issue. We then set out the evidence introduced at the preliminary injunction hearing concerning the monuments. We then examine the various affidavits introduced by the parties in support of, and in opposition to, Mr. McGraw’s request for injunctive relief.
A
In voting to remove the three monuments at issue, the City Council relied upon City Code section 146-611, which is situated within the Article VII of Chapter 146 of the City’s codified ordinances. Article VII governs public monuments, while Chapter 146 sets out the City’s regulations concerning streets, sidewalks, and other public places. The section itself is entitled “Removal from public property,” and provides in general that “[m]onuments, statues, plaques, or other structures, erections, or works of art commemorating an event or individual shall be removed from outdoor display on public property when required by and in accordance with the *324 provisions of this section.” City Code section 146-611(a). Subsection (b) specifically empowers the City Council “[o]n its own motion orjjupon presentation of a request of an elector of the city ... [to] conduct a hearing to determine whether or not any monument, statue, or similar thing honoring or commemorating any person or event that is located on property owned or controlled by the city should be removed from public outdoor display.” City Code section 146—611(b). Subsection (b) further provides that the “council may, by ordinance, cause the removal of the monument, statue, or other thing located outdoors on city property covered by the provisions of this section upon a finding that the thing constitutes a nuisance” in that the monument or statue:
(1) ... honors, praises, or fosters ideologies which are in conflict with the requirements of equal protection for citizens as provided by the constitution and laws of the United States, the state, or the laws of the city and gives honor or praise to those who participated in the killing of public employees of the city or the state or suggests the supremacy of one ethnic, religious, or racial group over any other, or gives honor or praise to any violent actions taken wrongfully against citizens of the city to promote ethnic, religious, or racial supremacy of any group over another;
(2) Has been or may become the site of violent demonstrations or other activities that may threaten life or property; and
(3) Constitutes an expense for maintenance or the provision of security on a recurring basis that is unjustified when weighed against the historical or architectural significance, if any, of the thing and/or the merits of or reasons for outdoor display of the thing.
City Code section 146-611(b).
Subsection (c) directs the City Council, when conducting a hearing in accordance with this section, to “solicit the recommendations of the city planning commission when required by the City Charter and comments and recommendations of the historic district landmarks commission, the Vieux Carré Commission (if applicable), other government or private historical offices or | ^societies, the chief administrative officer, the city attorney, the superintendent of police, and the director of the department of property management.” City Code section 146-611(c). This subsection further indicates that the council “shall also provide for the submission of comments and testimony by the public ... [and] request that public hearings be conducted by and recommendations obtained from the human relations commission or other appropriate agencies.” Id.
In the aftermath of such hearings, “the council may by ordinance declare the monument, statue, or other thing covered by the provisions of this section a nuisance and may provide for the removal of the thing from outdoor public display.” City Code section 146-611(d). Subsection (d), nevertheless provides that the removed monument “may then be displayed indoors at an appropriate facility, such as a museum or stored, donated (if it has no monetary value) or otherwise disposed of in accordance with provisions of law.”[9] Id.
*325 B
We next examine the three monuments at issue.
The Beauregard monument honors Pierre Gustave Toutant Beauregard, a Confederate general who was born in St. Bernard Parish. It depicts him in ^Confederate military uniform sitting astride a horse. The monument is situated on public property at the entrance of City Park within a traffic circle at the intersection of Esplanade Avenue, North Carroll-ton Avenue, and Wisner Boulevard. Although it was paid for by funds raised and donated by a private association, the monument was donated to the City in 1907 and publicly dedicated in 1915. Since its dedication, the monument has been maintained through private and public funds and was placed on the National Register of Historic Places in 1999.
The Jefferson Davis monument memorializes the first, and only, president of the Confederate States of America. The process leading to the construction of this monument began in 1910 when the City enacted Ordinance 6737, N.C.S. This ordinance changed the name of what was then known as Hagan Avenue to Jefferson Davis Parkway, and dedicated a section of the thoroughfare’s neutral ground near its intersection with Canal Street for the erection of a statue in Davis’ honor by the Jefferson Davis Monument Association. The ordinance obligated the Association to care for and maintain the site during the monument’s construction. The Davis Monument was publicly dedicated in 1911.
The Robert E. Lee monument is situated atop a monolith, which in turn is placed in the middle of a circular park that was formerly known as Tivoli Place. The statue depicts Lee in Confederate uniform. The record, in addition to longstanding jurisprudence, establishes that the park is public property owned by the City. See Sarpy v. Municipality No. 2, 9 La.Ann. 597, 600 (La. 1854). The monument was commissioned and constructed by the Robert E. Lee Monumental | ^Association of New Orleans, which was founded in 1870. The monument itself was authorized in 1877 by City Ordinance No. 4602, A.S., which granted the use of Tivoli Circle to the Monumental Association for the purpose of erecting the monument. The Ordinance granted the Monumental Association a five-year right to enclose and restrict access to the site for purposes of the monument’s construction. After completion, the monument was donated to the City by the Monumental Association, and publicly dedicated to the memory of General Lee, in 1884. In 1991, the monument was placed on the National Register of Historic Places. Evidence in the record indicates that at least $200,000 in private and public funds have been spent on repairs and maintenance of the monument.
C
In support of his case, Mr. McGraw introduced three affidavits from: 1) himself; 2) Lawrence J. Robichaux; and, 3) Thomas Bruno.[10]
Mr. McGraw, in his affidavit, avers that he is a resident of New Orleans, Louisiana. In 1989, after learning that the City did *326 not provide funding to the Department of Property Management for the maintenance of its monuments, he began to invest his own time, money, and labor in the upkeep of the City’s monuments. He avers that he has worked hundreds of hours, and spent thousands of his own dollars, in the maintenance and upkeep of the City’s monuments, including the three that are the subject of this matter. His actions were motivated out of sense of civic concern, historic preservation, and filial duty, given that In several of his ancestors served under both Generals Beauregard and Lee. He, also, avers that he has participated in Civil War reenactments, living history projects, and commemorative events which took place at the three monuments at issue. This affidavit, Mr. McGraw thus asserts, establishes that he has acquired rights in the monuments by operation of the doctrine of negotiorum gestio and Article XII, Section 4 of the Louisiana Constitution.
Mr. Robichaux avers that he is an expert in rigging and crane operations. In his opinion, it would be very difficult to remove, transport, and store the monuments at issue. Because the statues are not symmetrical, Mr. Robichaux avers that it will be difficult to determine the midpoint of each monument. He, therefore, concludes that removal and transportation of the monuments will require “a high degree of experience and expertise in both rigging and crane operations.” Mr. Robichaux accordingly concludes that “unless the riggers and crane operators engaged to move and transport these ... monuments are trained and experienced in complex and complicated lifts, there is a significant chance one or more of the monuments will be damaged.”
Mr. Bruno is a sculptor and owner of the Thomas Bruno Gallery and Studio. In his affidavit, Mr. Bruno opines on the potential harm to the Lee and Beauregard monuments in the event the City attempts to move them. He avers that antique bronze statues are not easily moved because they are fragile and difficult to repair. On the other hand, he notes that any efforts to heat or weld the monuments would result in irreparable damage due to the fact that the bronze would become molten |1gand deformed. He asserts, however, that any further attempts to repair the monuments would be complicated by the fact that the bronze plates are most likely attached to an iron infrastructure that has rusted and weakened over the years. Mr. Bruno, therefore, concludes that any damage to the Lee and Beauregard monuments would be irreparable.
The City, in opposition to Mr. McGraw’s request for injunctive relief, introduced various documents and affidavits outlining the legislative history of the removal ordinance as well as various affidavits and memoranda considered by the City Council prior to voting on the removal ordinance in order to show that it acted in accordance with City Code section 146-611 in enacting the removal ordinance at issue. Specifically, the City introduced letters, affidavits and memoranda from: 1) Mayor Landrieu; 2) Eleanor Burke, Deputy Director of the Historic District Landmarks Commission for the City; 3) Larry Bagneris, Chair of the City’s Human Relations Commission; 4) Larry Hesdorffer, Director of the Vieux Carré Commission; 5) George A. Patterson, the City’s Director of Property Management; 6) Michael S. Harrison, the City’s Superintendent of the Department of Police; 7) Rebecca H. Dietz, City Attorney; 8) Andrew D. Kopplin, First Deputy Mayor and Chief Administrative Officer; and, 9) Vincent A. Smith, Director of Capital Projects for the City.
In his letter of June 26, 2015, Mayor Landrieu formally called upon the City *327 Council to initiate legal process under City Code section 146-611. The ordinance, he observed, mandates that the Council hold a hearing and solicit comments and | ^recommendations from the Historic District Landmarks Commission, the Chief Administrative Officer, the City Attorney, the Superintendent of Police, and the Director of Property Management. Mayor Landrieu further noted that prior to the Council’s public hearing, an additional public hearing must be conducted by and recommendations obtained from, the City’s Human Relations Commission.
With her affidavit, Ms. Burke, the Director of the Historic District Landmarks Commission, avers that after a public meeting held on August 13, 2015, the HDLC voted to recommend the removal of the three monuments at issue. In support, Ms. Burke attached her letter to the City Council informing it of the Commission’s decision, as well as the minutes from the August 13, 2015 meeting. The minutes reflect that the Commission found that the monuments reflect the beliefs and attitudes held by many Southerners during the late nineteenth and early twentieth centuries popularly characterized as “the Cult of the Lost Cause.” The commission further found that the monument sites have been the focus of protests against their removal, and that hundreds of thousands of dollars have been spent in public and private funds for their upkeep.
In his affidavit, Mr. Bagneris averred that on August 13, 2015, the Human Relations Committee held a public hearing in response to the Council’s request for comment concerning the removal of the monuments. In an attached letter, he explains that at its August 12, 2015, meeting the Commission considered the Council’s request for removal of the monuments in accordance with City Code section 146-611. He wrote that the Commission unanimously voted to recommend | ^removal of the monuments after concluding that they conflict with the requirements of equal protection for the City’s citizens.
In his affidavit, Mr. Patterson, the City’s Director of Property Management, attached a letter directed to the City Council in which he stated that the City has spent thousands of dollars for the maintenance of the monuments and that their continued upkeep “constitutes an expense that outweighs the historic importance and/or basis for display on public property.” He, thus, recommended the monuments’ removal. With his affidavit Superintendent of Police Harrison attached a letter addressed to the Council in which he stated that the monuments had been the location of protests, some violent, over the years and likewise recommended their removal.
In her affidavit, Ms. Dietz attaches a legal memorandum that she, as City Attorney, authored for the benefit of the City Council in which she explained why the monuments constitute a nuisance under City Code section 146-611. She first concludes, after discussing applicable federal and state equal protection jurisprudence, that “race classifications generally are unacceptable, and any monument fostering ideologies in conflict with the concept of racial equality may constitute a nuisance under Section 146-611.” She then examines each of the monuments at issue. She notes that each monument depicts the subject in the context of their service to the Confederate States of America, an entity she concludes that was dedicated to the promotion “of a system that defied the Constitutional principle of equal protection of the law.” She also observes that | TSeach of the monuments has been the subject of either vandalism, protests, or both, and that public funds have been spent to repair the monuments and provide security when protests have occurred. Ms. Dietz, accord *328 ingly, concluded that each of the three monuments constitutes a nuisance in accordance with City Code section 146-611.
With his affidavit, Mr. Kopplin attaches a letter he authored and directed to the City Council in which he concluded that the monuments should be removed in accordance with City Code section 146-611. His letter notes that the cost associated with the monuments’ removal has been estimated at approximately $126,000 by the City’s Capitol Projects Division. Lastly, Mr. Vincent averred in his affidavit that the City, after passage of the removal ordinance, engaged a contractor to provide a proposal for the removal, transportation, and storage of the monuments. He averred, however, that the contractor withdrew from the bid process after its staff, its owner, and the owner’s family had received death threats in connection with the contractor’s involvement with the project.[11]
II
On appeal, Mr. McGraw argues that the February 5, 2016 judgment should be reversed because the district judge erred in failing to: 1) recognize that he has vested property rights in the monuments, acquired by virtue of the civilian doctrine of negotiorum gestio; 2) hold that these rights in the monuments are protected by 11fistate and federal substantive and procedural due process provisions[12]; 3) find that removal of the monuments would damage his right to the preservation, fostering, and promotion of his historical and cultural origins under Louisiana Constitution Article XII, Section 4; 4) conclude that City Code section 146-611 violates Article I, Section 4, of the Louisiana Constitution, which protects private property rights from unreasonable restrictions and exercises of police power; and, 4) rule that irreparable harm would result from the City’s violations of his rights in the monuments should the monuments be removed.
Having reviewed the record and the applicable law in light of Mr. McGraw’s arguments we find that the district judge did not err when she denied his request for a preliminary injunction. Mr. McGraw did not acquire any type of vested property rights in the monuments by operation of either the civilian doctrine of negotiorum gestio, or Article XII, Section 4, of the Louisiana Constitution. Simply put, neither the doctrine of negotiorum gestio, nor the provisions of Article XII, Section 4, operate to vest persons with ownership rights in things. Moreover, even if rights in things could be acquired by operation of negotiorum gestio and Louisiana Constitution Article XII, Section 4, the monuments at issue are public things held by the City in its public capacity. Therefore, Mr. McGraw cannot acquire rights in the monuments. Mr. McGraw, accordingly, has failed to establish that he has acquired vested property rights in the monuments such that their removal would trigger any type of due process analysis, or violate the protections 117afforded by Section 4, Article I, and Section 4, Article III of the Louisiana Constitution. Absent such a vested property right, therefore, Mr. McGraw cannot establish that the monuments’ removal would cause irreparable harm to him. Although Mr. McGraw offered some evidence that the monuments might be *329 damaged as a result of their removal, transportation, and storage, he has failed to establish that he would suffer irreparable harm in the event such injuries were to befall the monuments.
A
“A preliminary injunction is an interlocutory procedural device designed to preserve the status quo as it exists between the parties, pending trial on the merits.” Smith v. Brumfield, 13-1171, p. 5 (La.App. 4 Cir. 1/15/14), 133 So.3d 70, 74. Injunctive relief is an equitable remedy, which is ordinarily only available when a party has no adequate legal remedy. Cf. West v. Town of Winnsboro, 252 La. 605, 211 So.2d 665, 670 (La. 1967) (on rehearing) (“By adequate remedy at law is meant one which is as speedy, efficient, and complete as the remedy in equity.”). See also C. Napco, Inc. v. City of New Orleans, 06-0603, p. 6 (La.App. 4 Cir. 3/7/07), 955 So.2d 155, 160 (“An injunction is a harsh, drastic remedy that should only issue where the petitioner is threatened with irreparable harm and has no adequate remedy at law.”).
A “court may hear an application for a preliminary injunction ... upon the verified pleadings or supporting affidavits, or may take proof as in ordinary cases.” La. C.C.P. art. 3609. “A preliminary injunction shall not issue unless notice is 11 ¡¡given to the adverse party and an opportunity had for a hearing.” La. C.C.P. art. 3602. Ordinarily, to prevail in the district court on a petition for preliminary injunction, the petitioner is required to establish by p?ima facie evidence that: 1) he will suffer irreparable injury, loss, or damage if the motion for preliminary injunction is not granted; and 2) he is entitled to a preliminary injunction through at least a showing that he will likely prevail on the merits of the case. See Historic Restoration, Inc. v. RSUI Indem. Co., 06-1178, p. 11 (La.App. 4 Cir. 3/21/07), 955 So.2d 200, 208; La. C.C.P. art. 3601. The prima facie standard of proof to obtain a preliminary injunction is less than that required for a permanent injunction. See Smith, 13-1171 at p. 6, 133 So.3d at 74.
“A trial court has broad discretion in the granting or denial of a preliminary injunction, and will not be disturbed on review absent a clear abuse of that discretion.” Yokum v. Pat O’Briens Bar, Inc., 12-217 p. 6 (La.App. 4 Cir. 8/15/12), 99 So.3d 74, 80 (citing Smith v. West Virginia Oil & Gas Co., 373 So.2d 488, 493 (La. 1979)) (internal quotations omitted). This “broad standard is, of course, based upon a conclusion that the trial court committed no error of law and was not manifestly erroneous or clearly wrong in making a factual finding that was necessary to the proper exercise of its discretion.” Yokum, 12-0217 at p. 7, 99 So.3d at 80 (citing South East Auto Dealers Rental Ass’n, Inc. v. EZ Rent to Own, Inc., 07-0599, pp. 4-5 (La.App. 4 Cir. 2/27/08), 980 So.2d 89, 93). Absent a clear abuse of discretion, the denial of a preliminary injunction will not be overturned on | ^appeal. See Oestreicher v. Hackett, 94-2573, p. 3 (La.App. 4 Cir. 5/16/95), 660 So.2d 29, 31.
B
We now explain why Mr. McGraw has failed to establish that he will suffer irreparable harm. In order to prove that irreparable harm will befall a party from the non-issuance of a preliminary injunction, the petitioning party must show that “money damages cannot adequately compensate for the injuries suffered and that the injuries ‘cannot be measured by pecuniary standards.’ ” Historic Restoration, 06-1178 at p. 11, 955 So.2d at 208 (quoting Saunders v. Stafford, 05-0205, p. 6 (La.App. 4 Cir. 1/11/06), 923 So.2d 751, *330 754). “[M]ere inconvenience is not enough to show irreparable injury needed for the issuance of a preliminary injunction.” Hobbs v. Gorman, 595 So.2d 1264, 1266 (La. App. 4th Cir. 1992).
Here Mr. McGraw’s arguments are premised upon the assertion that he has acquired vested property rights in the monuments in question and that any damage occasioned by their removal, transportation, and storage will cause irreparable harm to these rights. In so doing, he relies upon the civilian doctrine of negotiomm gestio, and Article XII, Section 4 of the Louisiana Constitution. Mr. McGraw, however, can rely on neither civilian doctrine nor constitutional provision to support his claims. The monuments in question, moreover, are public things held by the City in its public capacity. They are, therefore, insusceptible to ownership by natural or juridical persons. And while Mr. McGraw has offered some evidence that the monuments might possibly be damaged as a result of their 1 ^removal or transportation, he has not shown that such damage would harm him irreparably.
1
The rules governing the doctrine of negotiomm gestio are located in Title V of Book III of the Civil Code, which governs obligations without agreement, or quasi-contracts. Article 2292 defines negotiomm gestio accordingly: “There is a management of affairs when a person, the manager, acts without authority to protect the interests of another, the owner, in the reasonable belief that the owner would approve of the action if made aware of the circumstances.” Thus, the doctrine applies when the manager acts for the benefit of the owner, instead of in furtherance of his own interests. See La. C.C. art. 2292, cmt. (d), Kirkpatrick v. Young, 456 So.2d 622, 624-625 (La. 1984). Article 2294 sets out the duties of the manager, who “is bound, when the circumstances so warrant, to give notice to the owner that he has undertaken the management and to wait for the directions of the owner, unless there is immediate danger.” Similarly, Article 2295 provides that the “manager must exercise the care of a prudent administrator and is answerable for any loss that results from his failure to do so.” As for the owner whose affairs have been managed, Article 2297 indicates that he “is bound to fulfill the obligations that the manager has undertaken as a prudent administrator and to reimburse the manager for all necessary and useful expenses.” Such reimbursements, however, may be reduced in the event it is established that the manager failed to act as a prudent administrator. See La. C.C. art. 2295.
[2) Article 477 of the Louisiana Civil Code defines ownership as “the right that confers on a person direct, immediate, exclusive authority over a thing.” La.C.C. art. 477. Thus, the “owner of a thing may use, enjoy, and dispose of it within the limits and under the conditions established by law.” Id. The provisions of the Civil Code indicate clearly that the doctrine of negoti-omm gestio confers no ownership rights upon the manager who undertakes without authority the administration of another’s affairs. At most, the manager who acts as a prudent administrator acquires a right of reimbursement against the owner. See La. C.C. art. 2297. Indeed, our research into the matter has revealed nothing which even suggests that such a right of reimbursement gives the manager an ownership interest in the thing managed. Mr. McGraw, therefore, cannot rely upon the principle of negotiomm gestio to establish vested rights in the monuments.
2
Mr. McGraw, likewise, cannot rely upon Section 4, of Article XII, of the Loui *331 siana Constitution, to establish a vested property right in the monuments. This provision recognizes “the right of the people to preserve, foster, and promote their historic linguistic and cultural origins.” Significantly, the only reported decision interpreting this provision arises out of the Monumental Task Committee’s attempt to secure injunctive relief in federal court. In rejecting this claim, Judge Barbier observed:
The driving force behind the provision was preservation of the French language and culture. Lee Hargrave, “Statutory” and Hortatory” Provisions of the Louisiana Constitution of 1974, 43 La. L. Rev. 647, 682 (1983). The law was supported primarily by French-speaking |22delegates who were concerned with the protection of the Acadian French culture. Id. No court has ever invalidated a law using this provision.
Professor Lee Hargrave suggested that the development and intent of article XII, section 4 support a narrow construction of the law. For example, the principal drafter’s stated intent was “to encourage bilingualism rather than make a drastic innovation.” Id. at 684.
[[Image here]]
Considering the legislative history, Har-grave argued that “[a]t best, this provision might be seen as a particularization of those principles protecting the rights of association that have been grafted onto the first amendment, encompassing a right to unite and associate for promotion of certain values and causes.” Id. However, “as with its first amendment cousin, it is unlikely that the section would be invoked to protect all cultural origins.” Id. For example, it would not permit a citizen who immigrated to Louisiana “to foster his origins by committing ritualistic robbery and murder.” Id. Thus, the rights covered by article XII, section 4 are “vague ones that can be balanced against other interests.” Id.
Monumental Task ' Comm., 157 F.Supp.3d at 600.
Judge Barbier rejected the federal plaintiffs’ contention that removal of the monuments will infringe upon their right to preserve, foster, and promote their historic, linguistic, and cultural origins, after concluding that the plaintiffs had no right to “compel the City to promote their culture.” Monumental Task Comm., 157 F.Supp.3d at 600, citing Hargrave, supra, at 684 (wherein he explains that Article XII, Section 4 does not establish a right to have public schools teach particular historic, linguistic, and cultural origins). Having reviewed Judge Barbier’s analysis of Article XII, Section 4, and Mr. McGraw’s arguments in the present proceeding, we see no reason to depart from the learned judge’s conclusion. Mr. McGraw, therefore, has failed to establish that he has acquired vested property | ^rights in the monuments at issue by operation of Article XII,' Section 4 of the Louisiana Constitution.
3
Mr. McGraw’s arguments also ignore the fact that the evidence in the record establishes that each of these three monuments are public things that have been dedicated to public use. Article 448 of the Louisiana Civil Code provides that things are divided into common, public, and private things. Article 450 specifically states that, “Public things are owned by the state or its political subdivisions in their capacity as public persons.” “The very definition of a '‘public thing’ prohibits a private person from owning a public thing.” Band v. Audubon Park Comm’n, 05-0937, p. 5 (La.App. 4 Cir. 7/12/06), 936 So.2d 841, 845. The Jurisprudence has interpreted Article 450,., which specifically provides examples of public things which *332 may be owned by a political subdivision “[s]uch as streets and public squares,” to also include public parks owned by a political subdivision in its public capacity.[13] See Id. We do not hesitate to conclude that the monuments at issue are public things given that the undisputed evidence establishes clearly that they were erected on public property, owned by the City in its public capacity, and subsequently dedicated to the public use.
Equally clear is the fact that the City is a “political subdivision” of the State. As such the City may own streets, public squares, and public parks in its public capacity. See Band, 05-0937, p. 6, 986 So.2d at 845. Public things, being | ^insusceptible of private ownership, are inalienable, imprescriptible and exempt from seizure. See 2 La. Civ. L. Treatise, Property, sections 3:5, 3:8-3:11 (5th ed.). As the Supreme Court observed in City of New Orleans v. Carrollton Land Co., 131 La. 1092, 1094-1095, 60 So. 695, 696 (1913): “Such property is out of commerce. It is dedicated to public use, and held as a public trust, for public uses. It is inalienable by [municipal] corporations. If the position of the city in this suit be sustained, to the effect that the property in question is a public square, defendant cannot have acquired title thereto by prescription or otherwise.” The inalienability of all public things, whether belonging to the State or its political subdivisions, is guaranteed by the Civil Code. See La. C.C. art. 450; Band, 05-0937, p. 6, 936 So.2d at 845. While it is possible to acquire things which are owned by a political subdivision in its private capacity, it is not possible for persons to acquire those things which are owned by a political subdivision in its public capacity.[14] See Band, 05-0937, pp. 6-7, 936 So.2d at 845. The monuments at suit, therefore, are public things owned by the City in its capacity as a public person. See La. C.C. art. 450. And, as we have previously concluded, “the location, the manner and design” of the City’s monuments are “within the sound discretion of the governing ^authorities.” State ex rel. Singelmann v. Morrison, 57 So.2d 238, 244 (La.App. Orl. Cir. 1952) (holding that the City of New Orleans had the right to permit erection on public property of a privately-funded memorial to the memory of Mother Cabrini).
CONCLUSION
Therefore, regardless of the theory advanced by Mr. McGraw, he has failed to establish that he acquired any type of vested property right in the monuments at suit. This being the case, he cannot establish that he would incur any irreparable harm in violation of federal and state constitutional provisions should the monuments be damaged by their removal, trans *333 portation, or storage.[15] And we observe that although he introduced some evidence which shows that the monuments might suffer damage upon their removal, transportation, or storage, he has failed to establish that such damage to the monuments will result in damage to him. We necessarily conclude, then, that Mr. McGraw is not entitled to the issuance of a preliminary injunction because he has failed to show that he will suffer irreparable harm as a result of the City’s past or present actions.
DECREE
We affirm the district court’s judgment of February 5, 2016, which denied Pierre A. McGraw’s request for a preliminary injunction against the City of New 1 ar,Orleans, and the Honorable Mitchell J. Landrieu in his capacity as Mayor of New Orleans.
AFFIRMED

. See City Ordinance 026750 Mayor Council Series. The ordinance also authorized the removal of the Liberty Place Monument, which commemorates an 1874 battle between the White League and the City’s first integrated police force. Mr. McGraw’s petition, however, does not seek to enjoin the removal of this monument,

. For purposes of brevity, we hereafter refer to the City and Mayor Landrieu collectively as "the City.”

.On February 14, 2016, Mr. McGraw amended his suit to add as party-plaintiff, the Lafayette Square Association, a Louisiana nonprofit corporation concerned with historic preservation respecting the Lafayette Square neighborhood and the Lafayette Square Historic District. The amending petition was filed after service of the original petition on the defendants. See La. C.C.P. art. 1151. However, it does not appear from the record that either Mr. McGraw or the Association obtained leave of court to either amend the petition or intervene in the case. In any event, the Association did not file a motion for appeal or seek supervisory review of the subsequent denial of injunctive relief.

. Mr, McGraw subsequently filed an application for supervisory writs concerning the district judge’s denial of his request for a temporary restraining order. We denied the writ application on January 28, 2016. See McGraw v. City of New Orleans, et al., unpub., 16-0098 (La. App. 4 Cir. 1/28/16), writ denied, 16-0208 (La. 2/3/16), 186 So.3d 1155.

. See La. C.C. art. 2292, et seq. Article 2292 provides: "There is a management of affairs when a person, the manager, acts without *323 authority to protect the interests of another, the owner, in the reasonable belief that the owner would approve of the action if made aware of the circumstances.”

.Article XII, Section 4 provides: “The right of the people to preserve, foster, and promote their respective historic linguistic and cultural origins is recognized.”

. See U.S. Const. Amend. XIV, Section I; La. Const. Art. I, Section 2,

. See La. Const. Art. I, Section 4 (A), which provides: “Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.”

. City Code section 146-611(e) further provides:
Whenever in the opinion of the city attorney removal of a thing is required by an ordinance of the council but such removal would apparently violate or conflict with the provisions of applicable federal or state law or a judgment or order entered by a federal or state court, the city attorney shall notify the city council and file an appropriate action or proceeding in an agency or court of competent jurisdiction seeking a *325 decision, declaration or order compelling or permitting such removal. The obligation of removal imposed by the ordinance shall be suspended until a favorable definitive judgment is obtained.
The present matter, however, does not implicate this subsection.

. The affidavits from Messrs. Bruno and Ro-bichaux were also introduced by the Monumental Task Committee in support of its federal district court action.

. Mr. Hesdorffer’s affidavit and attachments were directed solely to the removal of the Liberty Place Monument, and thus, are not relevant to the present discussion. We note, nevertheless, that the Vieux Carré Commission held a public hearing, considered the Council’s request for input, and voted to recommend removal or relocation of the Liberty Place Monument.

. See U.S. Const. Amend. XIV, Section 1; La. Const. Art. I, Section 2.

. Article 450's enumerations are illustrative rather than exclusive. See Comment (d) to La. C.C. art. 450.

. Given the thoroughly public nature of the monuments in question, it is clear that the removal ordinance does not run afoul of Article I, Section 4, of the Louisiana Constitution. This provision ensures that just compensation be paid to those whose private property has been taken or infringed upon by unreasonable statutory restrictions or exercises of police power. See State Through Dep't of Transp. & Dev. v. Chambers Inv. Co., Inc., 595 So.2d 598, 602 (La. 1992). It, accordingly, has no application to public things held by the City in its public capacity. Even if this provision were applicable, its guaranty of just compensation to an injured property owner would serve to defeat injunctive relief, which is applicable only when an applicant “cannot be adequately compensated in money damages for his injury or suffers injuries, which cannot be measured by pecuniary standards.” See Harvey v. State, 14-0156, p. 27 (La.App. 4 Cir. 12/16/15), 183 So.3d 684, 703.

. Given the fact that he has failed to establish any type of vested property right in the monuments at issue, we need not' address Mr. McGraw’s arguments that City Code section 146-611 is impermissibly vague or that the City Council failed to follow its dictates when passing the monument removal ordinance at issue.